UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

| | |
|---|---|
| DONALD J. GAY, ) | |
|               Plaintiff, ) | |
| v. ) | |
| ) | Case No. 06-2182 |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
|               Defendant. ) | |

# O R D E R

In July 2005, Administrative Law Judge (hereinafter "ALJ") Gerald Rickert denied Plaintiff Donald Gay's application for social security supplemental security income and disability insurance benefits. The ALJ based his decision on a finding that Plaintiff was able to perform a number of jobs existing in the national economy.

In September 2006, Plaintiff filed a Complaint (#1) against Defendant Jo Anne Barnhart,[1] the Commissioner of Social Security, seeking judicial review of the ALJ's decision to deny social security benefits. In May 2007, Plaintiff filed a Motion for Summary Judgment (#13). In August 2007, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#15). In October 2007, Plaintiff filed a Reply Brief (#18). After reviewing the administrative record and the parties' memoranda, this Court **DENIES** Plaintiff's Motion for Summary Judgment **(#13)**.

## I. Background
### A. Procedural Background

Plaintiff first filed an application for benefits in October 2002, alleging that he became disabled in June 2002. (R.18.) Plaintiff's application for disability states he is disabled due to learning disability, blood clots and poor circulation in his legs, and severe migraines. (R. 72.)

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d)(1), we have substituted Michael J. Astrue for Jo Anne B. Barnhart as the named defendant-appellee.

His claim was denied both initially and on reconsideration. (R. 26, 34.) Plaintiff requested a hearing, which the ALJ held in July 2005. He was represented by counsel at the hearing. In July 2005, the ALJ denied the application and Plaintiff appealed the denial. In July 2006, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Plaintiff then filed his complaint in federal court pursuant to 42 U.S.C. § 405(g).

### B. Plaintiff's Background

Plaintiff was twenty-two years old on his alleged onset date and twenty-five at the time of the ALJ's decision. (R. 18, 277.) He completed twelfth grade in a special education program. He has worked as a fast food cook, cleaner, sales clerk, and machine packager. (R. 18, referring to R. 85-91, 278-79.)

### C. Medical Evidence

Plaintiff's application for disability benefits indicates that he experiences blood clots and poor circulation in his legs, headaches, and that he is learning disabled. (R. 72.)

Regarding Plaintiff's leg problems, Plaintiff has been diagnosed with deep vein thrombosis (hereinafter "DVT") and obesity, which contribute to clots, poor circulation, pain, swelling, and cramps in his legs. Dr. Daesun Oh treated Plaintiff for these conditions and other ailments from 1992 to September 2001. (R. 173-95.) In 1996, Plaintiff complained to Dr. Oh of pain in his left calf that was aggravated by walking. (R. 193-194.) He took Coumadin, a prescription medication, to address this problem and improve circulation in his legs. (R. 192.) In 1998, Plaintiff met with Dr. Oh concerning sharp pain in his right groin and burning sensation down his leg caused by DVT, and swelling of his left knee. (R. 189.) Plaintiff was briefly hospitalized for the groin condition. (R. 188.) On a follow-up visit to Dr. Oh, Plaintiff continued to have problems with walking and standing, and Dr. Oh increased his prescription of Coumadin. (R. 189.) In August 2001, Plaintiff saw Dr. Oh regarding right calf pain, problems

standing and walking, and other ailments. (R. 183.) Dr. Oh referred him to Hoopeston Community Memorial Hospital, where doctors confirmed that pain and heaviness in his right leg was due to DVT. (R. 145-57.)

Plaintiff's alleged onset date is June 30, 2002, and medical records indicate ongoing problems. In March 2003, Plaintiff went to the emergency room of United Samaritans Medical Center for swelling in his left leg, and one clinic note indicated that he had recently been treated for a blood clot. (R. 221.) In April 2003, Plaintiff went to the emergency room with complaints of left leg swelling. (R. 221.) In May 2003, Plaintiff sought treatment for swelling behind his left knee. (R. 237-46.) In September 2003, doctors at Charlotte Ann Russell Medical Center noted that he was "not really having any problems [with his] legs," and Plaintiff reported leg cramps if he walked too much. (R. 244.) He weighed at least 350 pounds; exact weight is unknown because the scale did not register above this weight. (R. 244.) In July, August, and September of 2004, Plaintiff continued to experience swelling behind his left knee. (R. 242-46.) In October 2004, Plaintiff sought treatment at Carle Heart Center for swelling and discoloration of the left leg. (R. 231, 251.) This swelling and discoloration had lasted for two months. (R. 233.) Doctors noted that he had chronic venous insufficiency and had experienced multiple DVTs (blood clots) in the deep veins of his legs. (R. 233-34.) Plaintiff was advised to wear elastic stockings to prevent his condition from worsening, but Plaintiff says he did not obtain the stockings because he could not afford them. (R. 234, 285.) In October 2004, Dr. Tim Connelly, a vascular surgeon, examined Plaintiff and stated that surgery was not needed at that time. (R. 251.)

Plaintiff also listed learning disabilities as a cause of disability on his application for disability benefits. Plaintiff received special education services while he was in school. In 1997, testing showed that Plaintiff has a verbal IQ of 69, a performance IQ of 75, and a full scale IQ of 70. (R. 122.) A school psychologist noted that Plaintiff's verbal ability, performance ability, and overall ability all fell within the "borderline impaired" range. (R. 123.)

In October 2002, Dr. James Mason performed a psychological evaluation of Plaintiff at

3

the request of the state agency. Dr. Mason concluded that Plaintiff's verbal IQ is 87, his performance IQ is 94, and his full scale IQ is 89, within the low average range of intelligence. (R. 199.)

In January 2003, Dr. Phyllis Brister, a state agency consultant, examined Plaintiff's records to determine his mental residual functional capacity (hereinafter "RFC") related to his learning disability. Her report indicated that Plaintiff has mild restriction of daily activities, mild difficulties maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 212.) The report also indicated that Plaintiff is moderately limited in his abilities to understand and remember detailed instructions and to carry out detailed instructions. (R. 216.)

Plaintiff also stated in his application for disability benefits that he has severe headaches. (R. 78.) The record contains no medical evidence from physicians documenting Plaintiff's headaches. Plaintiff's testimony regarding headaches is described in the next section.

### D. The Hearing Before the ALJ

The ALJ held a hearing in October 2005, during which Plaintiff, Plaintiff's wife, and Jennie Chin, a vocational expert (hereinafter "VE"), testified.

Plaintiff testified that he is over six feet tall and weighs more than 350 pounds; the doctor's scale did not register over that weight. He lives in a single story home with his wife, her two children, and his wife's aunt. (R. 277-78.) He finished twelfth grade in special education, he is able to read and write "a little," and he has trouble with simple math. (R. 278.) He worked at McDonald's for some time, but he has not worked anywhere since 2002. (R. 279.) Regarding his physical condition, Plaintiff testified that he currently has circulation problems in both legs, he has had problems with blood clots since 1996, and he takes Coumadin to address this problem. (R. 279, 280.) The last time he had a blood clot in his leg was 2003. (R. 280.)

Plaintiff stated that taking Coumadin gave him headaches. (R. 280.) He experiences

4

these headaches about twice a day, and taking Tylenol or Ibuprofen generally provides relief. (R. 281.) Plaintiff describes the headaches as a very sharp pain, but notes that the sharp pain only lasts a minute. (R. 286.) This interferes with his concentration. (R. 286.)

Regarding his physical abilities, Plaintiff testified that he gets cramps and pain in his legs if he stands for more than five minutes. (R. 281.) He also experiences cramps if he sits without his feet elevated for more than ten or fifteen minutes, and if he walks even twenty feet (R. 286.) On a typical day, Plaintiff wakes up between 8 a.m. and 10 a.m., and goes to sleep between 10 p.m. and 11 p.m. (R. 282.) He will do some vacuuming, cooking on the grill with his feet elevated, and he will drive in emergencies. (R. 282.) He may go out with his wife to visit family and friends, but otherwise he does not go out socially. (R. 283.) He goes to the grocery store with his wife, but he sits in the car when he cannot finish shopping due to cramps. (R. 287.) He watches his stepchildren, but relies on his wife's aunt to help with them when they are playing outside. (R. 287.)

Plaintiff testified that, in October 2004, Dr. Connelly noted that his legs were swollen and discolored and that he had a possible ulcer behind his left kneecap. (R. 284.) Dr. Connelly advised Plaintiff to wear supportive stockings, but Plaintiff said he felt he could not afford the $260 expense. (R. 284, 285.) Plaintiff also testified that another doctor, Dr. Labiog, told him to keep his legs elevated whenever he sits. (R. 285.)

Plaintiff testified regarding his activities of daily living that illustrate his limitations due to learning disability. He cannot count change. (R. 287.) He can write, but his spelling is so bad that it is not always possible for his wife to understand his written messages. (R. 287.) He watches five to six hours of television a day and he reads the newspaper with the help of his wife. (R. 283.) His wife handles all of the family finances. (R. 287.)

Next, Plaintiff's wife, Abigail Gay, testified. They have been married for three years. (R. 288.) She works at Jerry's IGA in Hoopeston as a deli and bakery worker. (R. 289.) She testified that Plaintiff experiences chest pains and shortness of breath once in a while. (R. 289.) She also testified that roughly four times a week, Plaintiff wakes up with severe leg cramps and he cannot move. She will massage his legs so that he can get up. (R. 289.) Mrs. Gay believes she would have to miss work frequently if her aunt did not live in the home and help with child care and Plaintiff's health needs. (R. 291.)

Last, the VE testified. The ALJ asked the VE the following hypothetical question:

> Assume an individual born in 1980, completed twelve years of formal education in special education classes. Assume further that the individual is not capable of prolonged, frequent standing and walking, limited to simple, repetitive tasks and – oh, and assume that this individual's past work has been vocationally relevant past work [INAUDIBLE] fast food and grill. But within these limitations, no prolonged, frequent standing and walking; be simple, repetitive tasks.

(R. 292.) The VE testified that this hypothetical person could not perform Plaintiff's past work. (R. 292.) He could, however, perform the jobs of production worker, packer, information clerk, and general office work, all at the sedentary level. (R. 292.) The number of these jobs available within Illinois is as follows: 2,950 production worker positions, 818 packing positions, 4,436 information clerk positions, and 2,778 general office worker positions. (R. 293.) A person performing these jobs could elevate one leg while working, as long as he maintained a production rate required by the employer. (R. 293.) The VE testified that this analysis is consistent with data published by the U.S. Department of Labor and The Dictionary of Occupational Titles (hereinafter "DOT"), the Selected Characteristics of Occupations.

The VE testified that his analysis would not change if the hypothetical individual had to elevate both legs. He had observed the four jobs he listed, and noted that some individuals can maintain production rates with elevated feet and others cannot. (R. 294.) The VE conceded that most employees with elevated legs are not newly hired, and that he did not usually see new employees working in that manner. (R. 294, 295.)

### E.  The ALJ's Decision

The Social Security Administration (hereinafter "SSA") defines "disabled" as the inability "to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis. 20 C.F.R. § 416.920(a-f).  At each step, if no determination can be made, the Commissioner proceeds to the next step. 20 C.F.R. § 416.920(a)(4).  If the claimant is currently employed or was previously employed during the relevant period, he is not disabled. 20 C.F.R. § 416.920(a)(4)(i).  The second question is whether the claimant has a severe impairment that will last at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii).  If the claimant does not have a severe impairment, the inquiry ends. *Id*. However, if the claimant has a severe impairment, the third step is to ask whether the severe impairment meets or equals one listed in Appendix 1 to subpart P of part 404 of Chapter 20. 20 C.F.R. § 416.920(a)(4)(iii).  If it does, the claimant is disabled. *Id.*  If it does not, the fourth question is whether claimant is able to perform his past relevant work with his current impairment. 20 C.F.R. § 416.920(a)(4)(iv).  If he can, then he is not disabled. *Id*.  If he is not able to perform his past work, the fifth and final question is whether, with his current limitations, he can perform other work which exists in significant numbers in the national economy. 20 C.F.R. § 416.920(c)(1).

Here, the ALJ found that Plaintiff became unable to continue work in his current occupation on June 30, 2002, and remains unable to return to that work. (R. 21.)  He had not engaged in substantial gainful activity since June 30, 2002. (R. 21.)  The ALJ determined that the medical evidence established that Plaintiff had severe obesity, deep vein thrombosis of the legs, and a learning disability, but that he did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4.  (R. 21.)  The ALJ determined that Plaintiff had the RFC to perform the nonexertional

7

requirements of work except for an inability to do prolonged or frequent standing and walking and that Plaintiff was limited to simple and repetitive tasks.  (R. 21.)

The ALJ determined that Plaintiff was not able to perform his past relevant work. (R. 21.)  Based on the above RFC and the VE's testimony, the ALJ determined that Plaintiff was not disabled because he could perform a significant number of jobs that exist in the national economy.  (R. 28.)

## II.  Standard of Review

The ALJ's decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The United States Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consol. Edison Co. v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  Therefore, the question for review is not whether the claimant is disabled, but whether substantial evidence in the record supports the ALJ's finding of no disability.  *Id*.  The Court defers to the ALJ's determination of credibility, "so long as they find some support in the record."  *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993).

## III.  Discussion

Plaintiff argues that the Court should reverse the ALJ's decision or remand the decision for further proceedings because (1) the ALJ erred by finding that Plaintiff can perform the exertional demands of sedentary work, as such a finding is not supported by the opinions of any physicians of record; (2) the ALJ did not satisfy his burden of showing that work is available in the economy that Plaintiff can perform; and (3) the ALJ's credibility finding is not based on substantial evidence.

**A. RFC Finding**

Plaintiff first argues that the Court should remand for reassessment of Plaintiff's RFC because the record contains no medical evidence from any physicians that supports the ALJ's RFC assessment. Specifically, Plaintiff contends that the ALJ improperly interpreted bare medical findings in making his RFC assessment, and thus the RFC assessment cannot be sustained under the authority of *Bauzo v. Bowen*, 803 F.2d 917 (7th Cir. 1986). The record supports Plaintiff's contention that, although several physicians determined Plaintiff suffers from obesity and deep vein thrombosis, the record contains no formal assessment from a medical professional regarding Plaintiff's physical functionality.

In *Bauzo*, the Seventh Circuit stated that "[n]either the Appeals Council nor this court is qualified to make [a] medical judgment about residual functional capacity based solely on bare medical findings as to [a] claimant's condition." *Bauzo*, 803 F.2d at 926 (quoting *Lugo v. Sec'y of Health and Human Servs.*, 794 F.2d 14, 15 (1st Cir. 1986)). The case at bar is distinguishable from *Bauzo* because in this case, Plaintiff did not attend consultative examinations with a state agency physician, scheduled for the purpose of evaluating his physical RFC. In October 2002, Plaintiff missed his appointment with a state agency physician for the first time. (R. 199.) Plaintiff said he "just forgot" the initial appointment. (R. 199) The appointment was rescheduled for December 12, 2002. The SSA informed Plaintiff and his father, and also told Plaintiff that this would be the last time the appointment would be rescheduled, and Plaintiff said he understood. (R. 199.) On December 3, 2002, SSA called Plaintiff to remind him of his upcoming appointment. (R. 199.) On December 12, 2002, Plaintiff missed the appointment. (R. 199.) On January 27, 2002, Plaintiff called and said he forgot about the rescheduled appointment because he had not written it down. (R. 199.)

The Code of Federal Regulations provides that a claimant has a responsibility to provide evidence showing how his impairments affect his functioning during the time he claims he is disabled. 20 C.F.R. § 404.1512(c). The SSA informs claimants of this policy in the Application for Disability Insurance Benefits. The application, which Plaintiff signed on October 1, 2002, states, "I understand that I must provide medical evidence about my disability, or assist the

Social Security Administration in obtaining the evidence." (R. 60). Furthermore, the Regulations state that Social Security disability claimants may be denied benefits if they fail to appear at consultative examinations:

> If you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability or blindness, we may find that you are not disabled or blind . . . . If you have a good reason, we will schedule another examination. We will consider your physical, mental, educational, and linguistic limitations . . . when determining if you have a good reason for failing to attend a consultative examination.

20 C.F.R. § 404.1518. Under the plain language of this Regulation, the SSA may find claimants who fail to attend necessary consultative examinations are not disabled. The SSA informs claimants of this policy when they receive the Application for Disability Insurance Benefits, which states, "I understand that I may be requested by the state disability determination services to have a consultative examination at the expense of the Social Security Administration and that if I do not go, my claim may be denied." (R. 60.) In this case, even though Plaintiff failed to show up for his scheduled appointments, the SSA nevertheless allowed Plaintiff's disability application to proceed to a hearing and a decision based on available evidence.

Here, the SSA informed Plaintiff that failing to attend his appointments could result in a finding that he is not disabled. Nevertheless, Plaintiff, without good reason, twice failed to attend a consultative examination where such evidence would have been collected. As a result, the ALJ was unable to obtain medical evidence regarding Plaintiff's physical functional limitations. Plaintiff should not gain any advantage by failing to submit to the consultative exam. Under these circumstances, the Court cannot conclude that the ALJ erred by assessing Plaintiff's RFC based on the evidence available to him.

The ALJ determined that Plaintiff had the RFC to perform the nonexertional requirements of work except for an inability to do prolonged or frequent standing and walking, and he is limited to simple and repetitive tasks. (R. 21). The hypothetical question posed to the VE indicated that Plaintiff is not capable of prolonged, frequent standing and walking. (R. 292.)

Plaintiff had testified that he could sit with his feet in a normal, seated position for ten to fifteen minutes without experiencing leg cramps and swelling in his feet. (R. 285.) He also testified that he could walk only twenty feet, he could not lift any weight, and he could only stand for five minutes. (R. 281, 286.) Yet, nothing in Plaintiff's testimony indicates why he could not perform nonexertional work that does not require prolonged or frequent standing or walking.

Taken together with the factor of the missed consultative examinations, this Court cannot conclude that a reassessment of RFC is required where no discrepancy exists between the ALJ's RFC and Plaintiff's claims of his physical abilities. The ALJ determined Plaintiff is limited to work without prolonged standing or walking. (R. 292, 293.) This is consistent with Plaintiff's testimony that he is limited in his ability to stand and walk, and that he must keep his feet elevated when he sits. Because the ALJ's RFC assessment was consistent with Plaintiff's claimed impairments based on the evidence available, the Court denies Plaintiff's motion to remand.

### B.  The ALJ's Determination at Step Five

Plaintiff next argues that the ALJ failed to satisfy his burden of showing that there is work available in the economy that Plaintiff can perform. Specifically, Plaintiff contends that (1) the ALJ could not rely on the VE's testimony as substantial evidence because the ALJ posed an incomplete hypothetical question to the VE; and (2) the ALJ was not justified in relying on the VE's testimony because it was inconsistent with the DOT.

Plaintiff first contends that the ALJ provided an incomplete hypothetical question to the VE because it did not include Plaintiff's impairment regarding deficiency in concentration and pace. The Seventh Circuit has consistently held that to the extent the ALJ relies on testimony from a VE, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers; otherwise, the VE's testimony will not reveal whether there are jobs in the national economy that a person like the claimant could perform, and if so, how many.

*Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002); *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004).

The record indicates that Plaintiff has moderate difficulties in maintaining concentration, persistence, or pace. (R. 212). The ALJ apparently attempted to address theses difficulties by limiting Plaintiff to "simple and repetitive tasks." (R. 21). The Mental RFC Assessment indicates that, under the category of Understanding and Memory, Plaintiff exhibited moderate limitations in his ability to understand and remember detailed instructions. (R. 216.) Under the category of Sustained Concentration and Persistence, Plaintiff exhibited moderate limitations in his ability to carry out detailed instructions. (R. 216.) Thus, Plaintiff's limitations in his mental RFC are directly related to his ability to perform simple versus complex tasks. Furthermore, Dr. Brister stated in her assessment that Plaintiff "retains ability to understand, recall, & execute at least simple routine operations w/ adequate persistence & pace." (R. 218.) Based on this background, the Court concludes that the ALJ's limitation to simple, repetitive tasks adequately addresses Plaintiff's limitations in maintaining concentration, persistence, or pace.

Plaintiff's next contends that the Commissioner failed to sustain his burden of establishing that work exists in the national economy that Plaintiff can perform because the VE's testimony conflicts with the DOT. According to Plaintiff, the VE departed from the DOT without explaining why and the VE misidentified several jobs. Specifically, Plaintiff contends that the VE identified the jobs of production worker and information clerk as unskilled, while the DOT classifies them as semi-skilled, and the VE identified the jobs of packager and general office worker as sedentary work, when they are in fact medium in exertion and light in exertion, respectively. Plaintiff also contends that he cannot perform any of these jobs because they require a reasoning level of 2 or greater, which he claims is not consistent with the limitation to "simple, repetitive" tasks. Based on these three purported inconsistencies with the DOT, Plaintiff contends that he cannot perform any jobs mentioned by the VE.

12

The Commissioner responds that the VE's testimony did not refer to the four specific jobs identified by Plaintiff, but instead referred to the broad categories of production worker, information clerk, packager, and general office work. Thus, the VE rendered her opinion about the jobs existing in that category that she considered compatible with Plaintiff's limitations. The Commissioner notes: "The vocational expert did not provide and was not required under the regulations to provide specific DOT numbers for the four jobs cited. In his brief, Plaintiff produced DOT numbers for jobs he felt matched the vocational expert's sample jobs." (#16, p. 13, fn. 9.)

Here, the Court agrees with the Commissioner and concludes that the VE in fact referred to broad categories, rather than to the four particular jobs identified by Plaintiff. The fact that the VE did not provide DOT codes for particular jobs supports this conclusion. Also, the categories she mentioned encompassed more than 10,000 jobs in the State of Illinois, and she acknowledged some variability in working conditions within the categories she described, noting that some jobs could be performed with elevated feet and others could not, and that different employers would have different personal or sick time policies. (R. 294). Because the VE referred to broad categories, it is not particularly helpful to Plaintiff that four specific jobs within those categories are inconsistent with Plaintiff's limitations.

Plaintiff acknowledges that the ALJ complied with Social Security Ruling 00-4p by asking the VE whether her testimony was consistent with the DOT. Nevertheless, he contends that the ALJ erred by relying on the VE's testimony. Plaintiff notes that the ALJ has an affirmative duty to inquire whether the vocational expert's testimony is consistent with the DOT, and to resolve any apparent conflict. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). The Tenth Circuit further explains this standard as follows:

> [B]efore an ALJ may rely on expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask how his or her testimony as to the exertional requirement of identified jobs corresponds with the DOT, and elicit a reasonable explanation for any discrepancy on this point.

*Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999).

Here, the ALJ was justified in relying on the VE's testimony because there was no apparent conflict. SSR 00-4p states that "[w]hen there is an apparent unresolved conflict between [the] VE . . . and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . to support a determination or decision about whether the claimant is disabled." Thus, the ALJ must explain any conflict between the VE's testimony and the DOT only if the discrepancy was "identified" - that is, if the claimant, or the ALJ on his behalf, noticed the conflict and asked for substantiation. *Donahue v. Barnhart*, 279 F.3d 441, 447 (7th Cir. 2002). Raising a discrepancy between the VE's testimony and the DOT after the hearing is too late. *Id*.

The Eastern District of Wisconsin provides a compelling argument for why potential discrepancies between the VE's testimony and the DOT should not be raised after the hearing, even where the VE testified that there was no conflict between her testimony and the DOT:

> [T]he VE was not claiming that his testimony precisely paralleled the DOT. Rather, the VE was certifying that there were no conflicts between his testimony and the DOT, as SSR 00-04p requires . . . [I]f all of the conditions contained in the ALJ's hypothetical were set forth in the DOT, there would be no need for a VE; the ALJ could just look up the numbers himself. The purpose of the VE is to help the ALJ and provide more specific information about jobs than the DOT.

*Beth v. Astrue*, 494 F. Supp. 2d 979, 1008 (E.D. Wis., 2007).

Here, Plaintiff did not identify any discrepancies at the hearing. Thus, notwithstanding Plaintiff's several assertions in his memorandum and examples of conflicts between the VE and the DOT, the ALJ appropriately relied on the VE's testimony. Accordingly, this Court cannot conclude that the ALJ erred by relying on VE testimony that Plaintiff now contends is inconsistent with DOT.

### C. The ALJ's Credibility Finding

The ALJ determined that Plaintiff is "generally credible, but not to the extent alleged." (R. 19.) Plaintiff contends that this determination, along with the ALJ's statement that Plaintiff's condition is "generally controlled by Coumadin," is not based on substantial evidence.

This Court gives considerable deference to an ALJ's credibility finding and will not overturn it unless a plaintiff can show that those findings were patently wrong. *Urban v. Sullivan*, 799 F. Supp. 908, 911 (C.D. Ill. 1992). However, when credibility determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, reviewing courts have more freedom to review the ALJ's credibility determination. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

Here, Plaintiff contends his limitations rendered him incapable of even sedentary work. The ALJ gave several reasons for drawing the contrary conclusion that Plaintiff could perform sedentary work. First, in finding that Plaintiff was not disabled, the ALJ noted that his condition was "generally controlled" by prescription medication. (R. 19.) The record reveals that the medication prevents clots and has prevented the need for more than one emergency room visit since June 2002. The ALJ also noted that his doctors recommended only conservative treatment for his condition and they have not recommended surgery. (R. 19.) Second, Plaintiff reports that his prescribed medication can cause headaches, but that the headaches last no longer than thirty minutes if he takes Tylenol. (R. 20). This is not really a credibility issue, as the ALJ relied on Plaintiff's own testimony in concluding the headaches were a manageable side effect. Third, there are no objective signs of severe pain, such as abnormal weight loss or muscle atrophy. Fourth, Plaintiff reports that he does limited daily activities consistent with infrequent standing or walking, such as occasional vacuuming and driving in emergencies. (R. 20).

Plaintiff's counsel takes special issue with the fourth criterion, that the ALJ relied on Plaintiff's testimony regarding his limited daily activities to conclude that he can perform sedentary work. Plaintiff states that courts should use care in "placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). A review of the record shows that the ALJ placed no "undue weight" on reported household activities in this case. Based on the explanation in the decision, the Court cannot conclude that the ALJ's credibility determination constituted patent error.

15

### IV.  Summary

For the reasons set forth above, this court **DENIES** Plaintiff's Motion for Summary Judgment **(#13)** pursuant to sentence four of 42 U.S.C. § 405(g).[2]

ENTER this 30th day of June, 2008.

s/ DAVID G. BERNTHAL
U.S. MAGISTRATE JUDGE

---

[2]Under 42 U.S.C. § 405(g), sentence four, "[t]he court shall have the power to enter, upon pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing."